UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| DAVID ROGER MORTENSBAK, | 3:13-CV-03026-RAL |
| Plaintiff, | |
| vs. | |
| NICHOLAS BUTLER, POLICE OFFICER, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; PAUL WAYNE SMERSRUD, POLICE OFFICER, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; SARGENT MCMANUS, POLICE OFFICER, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; OFFICER SIEBENBORN, POLICE OFFICER, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; OFFICER THIELEN, POLICE OFFICER, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; RYAN BAKER, POLICE OFFICER, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; MIKE GILLIPIES, POLICE OFFICER, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; SAM CLEMMINGS, POLICE OFFICER, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; OFFICER LOHR, POLICE OFFICER, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; AND RANDY SAMPLE, DEPUTY STATES ATTORNEY, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; | OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| Defendants. | |

David Roger Mortensbak, an inmate in the South Dakota State Penitentiary, has filed a pro se civil rights lawsuit[1] under 42 U.S.C. § 1983 against Nicholas Butler, Paul Smedsrud,[2] Loren McManus, Andrew Siebenborn, Dan Thelen,[3] Ryan Baker, Jeff Gillespie,[4] Sam Clemens,[5] Jon Lohr, and Randy Sample (collectively, the Defendants). This Court screened the suit, allowed Mortensbak to proceed in forma pauperis, and directed service upon the Defendants. Doc. 7. This Court has denied Mortensbak's requests for appointment of counsel. Doc. 10; Doc. 26; Doc. 33. The Defendants have filed a motion for summary judgment, Doc. 34, which for the reasons stated below, this Court grants.

## I.   SUMMARY JUDGMENT STANDARD AND DOCUMENTS CONSIDERED

A court shall grant a motion for summary judgment upon a motion by a party only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A summary judgment motion must be supported by evidence on the record, which may include affidavits or declarations based upon personal knowledge. Fed. R. Civ. P. 56(c). The non-moving party is entitled to the benefit of having all reasonable inferences resolved in his or her favor, but the non-moving party must present specific facts showing a genuine issue for trial. Atkinson v. City of Mountain View, Mo., 709 F.3d 1201, 1207 (8th Cir. 2013). That is, a non-moving party must present "sufficient probative evidence" capable of supporting a finding in his or her favor, not "mere speculation,

---

[1]The caption of this case lists the Defendants as named and spelled in a typed portion of Mortensbak's original Complaint, see Doc. 1 at 3, which contains several spelling errors that were not apparent until after several documents had been filed, including this Court's Opinion and Order Granting Leave to Proceed In Forma Pauperis and Dismissing Complaint in Part, Doc. 7. In order to maintain continuity, the names in the caption will remain as originally listed, however each Defendant will be referred to by his actual name within this Opinion and Order.
[2]Listed as "Wayne Smersrud" in Mortensbak's list of Defendants. Doc. 1 at 3.
[3]Listed as "Officer Thielen" in Mortensbak's list of Defendants. Doc. 1 at 3.
[4]Listed as "Mike Gillipies" in Mortensbak's list of Defendants. Doc. 1 at 3.
[5]Listed as "Sam Clemmings" in Mortensbak's list of Defendants. Doc. 1 at 3.

conjecture, or fantasy." Mann v. Yarnell, 497 F.3d 822, 825 (8th Cir. 2007) (quoting Gregory v. City of Rogers, Ark., 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc)).

The Defendants filed their motion for summary judgment on November 17, 2014, Doc. 34, and contemporaneously filed a statement of material facts, Doc. 36, which was supported by affidavits of police officers who responded to the incident out of which Mortensbak's cause of action arose, Docs. 37, 38, 39, 40, 41, as well as individual officer reports of the incident, Docs. 37-1, 38-1, 39-1, 40-1, 41-5, a data disc with video from the responding police officers' vehicles, Doc. 41-6, the training records of the canine involved, Docs. 41-1–41-4, and statements made by Mortensbak during a deposition, Doc. 42-1. Mortensbak responded to the motion on December 30, 2014. On January 5, 2015, the Defendants replied. Doc. 46 at 2. Mortensbak responded to the Defendants' reply with four separate filings: a "Response," Doc. 47, two affidavits, Docs. 48, 50, and a brief, Doc. 49. Mortensbak also filed another motion to appoint counsel. Docs. 53, 54.

The Defendants argue that Mortensbak's response to their motion should not be considered because it was not filed within the time period prescribed by local rules. Doc. 46 at 2. Alternatively, the Defendants argue that Mortensbak should be deemed to have admitted the Defendants' statement of material facts, Doc. 36, because he did not respond to the statement of material facts in a manner consistent with local rules, Doc. 46 at 2; see also D.S.D. Civ. LR 56.1 (requiring responses to each numbered paragraph in the moving party's statement of material facts with a numbered response citing evidence on the record, and deeming uncontroverted facts admitted).

The Defendants filed their motion for summary judgment on November 17, 2014, and served Mortensbak by first-class mail that same day. Doc. 43. Local rules require the non-moving party to respond to a motion for summary judgment within twenty-one days, D.S.D. Civ.

LR 7.1, but because service was made by first-class mail, Mortensbak had three extra days to file a response, Fed. R. Civ. P. 6(d) (extending the time in which a party must act by three days when the party was served through the mail). Thus, Mortensbak had until December 11, 2014, to file his response to the motion for summary judgment. See also Fed. R. Civ. P. 6(a)(1) (excluding the day of the event triggering a time period from the time period). The envelope in which Mortensbak sent his responsive pleading was postmarked on December 27, 2014, Doc. 44, and Mortensbak's response to the motion for summary judgment was stamped as filed on December 30, 2014, Doc. 44-1. The certificate of service at the end of Mortensbak's response represents that Mortensbak gave his response to prison staff for mailing on December 16, 2014. Even assuming the prison mailbox rule applies to Mortensbak's response,[6] the document was filed five days after the expiration of the time period for responding to the motion for summary judgment.

A court has the discretion, for good cause, to extend the time period within which an action must be taken. Fed. R. Civ. P. 6(b). The rule sets forth a different standard depending on whether the time period has already expired. Id. Prior to the expiration of a time period, a court may extend the time period "with or without" a motion or a request by a party. Fed. R. Civ. P. 6(b)(1)(A). After the expiration of a time period within which one must act, a court may only extend the time for taking such action upon a motion by the party and only if the failure to act was caused by "excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). Mortensbak made no separate motion for an extension of the time to file a response to the Defendants' motion for summary

---

[6]The prison mailbox rule allows prisoners filing pro se civil rights complaints under § 1983 to have their complaints deemed "filed" on the day they deposit the complaint in their prison's internal mail system for forwarding to the district court. Sulik v. Taney County, Mo., 316 F.3d 813, 815 (8th Cir. 2003), reversed in part on other grounds, 393 F.3d 765 (8th Cir. 2005). In appellate proceedings, the prison mailbox rule has been extended to all documents filed by pro se prisoners. Fed. R. App. P. 25(a)(2)(C). Although there is no counterpart to Fed. R. App. P. 25(a)(2)(C) in district courts, some courts have applied the prison mailbox rule to district court filings. E.g., Bunch v. Riley, No. 06-5220, 2008 WL 4278174 (W.D. Ark. Sept. 18, 2008).

judgment. Therefore, in order to consider Mortensbak's response to the motion for summary judgment, this Court would have to interpret "the very filing" of the late response as a "motion" for extension of the time limit, as well as find that the other considerations—good cause and excusable neglect—have been shown. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 896–97 (1990). To interpret Mortensbak's filing in such a way would require ignoring the plain distinction Rule 6(b) makes between an action taken before the time to act has expired and an action taken after the time to act has expired. In addition, Mortensbak made no effort to show good cause or excusable neglect in his late-filed response to the Defendants' motion for summary judgment.[7]

However, that does not mean that the motion for summary judgment is automatically granted.[8] The Defendants still bear the burden of showing that there exists "no genuine dispute

---

[7]Following the filing of the Defendants' reply brief, Mortensbak filed a brief in opposition to the Defendants' reply brief in which he states that he was unaware of the twenty-one day time period, which he blames on his lack of "formal education in civil law" and the added difficulty of gaining access to legal materials due to his current incarceration. Doc. 47 at 1–2. Mortensbak's ingnorance of the time period in which to respond appears to have little to do with those circumstances as he was able to cite no fewer than twenty separate cases in his response to the motion for summary judgment. Doc. 44. Mortensbak was aware of the added difficulty of prosecuting a civil case while incarcerated by that stage of the proceedings, and the difficulties he cites are not likely to rise to the level of excusable neglect for missing an unambiguous deadline. Cf. Halicki v. Louisiana Casino Cruises, Inc., 151 F.3d 465, 470 (5th Cir. 1998) (holding late filing due to misinterpretation of an unambiguous deadline was not caused by excusable neglect).

[8]Even if the Court were to consider assertions of fact made by Mortensbak in his filings, it would not affect the outcome of this motion. In Mortensbak's motion in opposition, in which he swears "under penalty of perjury" and which is notarized, he makes only five factual assertions: (1) that Officer Butler did not give a verbal warning before releasing the police dog, (2) that Officer Butler failed to "call off" the police dog when other officers arrived, (3) that Officer Butler continued to beat Mortensbak "even after he was subdued," (4) that the officers allowed the police dog to bite Mortensbak after he was handcuffed, and (5) other responding officers failed to intervene in the use of force. Doc. 44 at 1–3, 5, 8. Of these statements, it is not disputed that Officer Butler did not give a verbal warning that the dog would be released if Mortensbak did not comply. As discussed below, the remaining assertions are clearly contradicted by the

of material fact" and that, on the undisputed facts, they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

## II.   ESTABLISHED FACTS NOT SUBJECT TO GENUINE DISPUTE

The Defendants in this case, except Defendant Randy Sample, were all members of the Sioux Falls Police Department at the time of the incident giving rise to this action. Defendant Sample is a Deputy Minnehaha County State's Attorney. The facts relevant to this motion are drawn from the Defendants' statement of material facts, Doc. 36, and the evidence proffered in support of that document. This Court has thoroughly examined the evidence and found that the Defendants' affidavits are consistent with each other, the police reports written near the time of the incident, and the video from responding police units. The video of the incident as recorded by the responding police units captured statements made contemporaneously with and immediately after the incident which gave rise to this suit. Those statements, which were made by the Defendants before they would have had an opportunity to fabricate an alternative version of the incident,[9] are consistent with the later-written reports.

Mortensbak was driving a silver Ford pickup the wrong way down West 11th Street in Sioux Falls, South Dakota, shortly after 7:00 p.m., on January 26, 2013. Doc. 41 at 1; Doc. 41-6; Doc. 42-1 at 2. Mortensbak had a passenger and a dog in the vehicle with him. Doc. 41 at 2; Doc. 41-6. Officer Butler witnessed Mortensbak driving the wrong way while Officer Butler was on duty and patrolling the area. Doc. 41 at 1. Officer Butler, who was in his marked patrol vehicle with police canine Doerak, was wearing a uniform identifying himself as a canine officer. Doc. 41 at 5. Officer Butler initiated a traffic stop of Mortensbak's vehicle, and

---

evidence—in particular, the police video—and amount to no more than "mere speculation, conjecture, or fantasy." See Mann, 497 F.3d at 825 (quoting Gregory, 974 F.2d at 1010).

[9]Such statements were "excited utterances" within the hearsay rule exception and are captured on the police vehicle videos. Fed. R. Evid. 803(2).

Mortensbak initially stopped in the parking area of a business. Upon approaching the driver's side door, Officer Butler noticed that an odor of alcohol emanated from inside Mortensbak's pickup, that Mortensbak's eyes were bloodshot and watery, that Mortensbak spoke with slurred speech, and that there was an open can of beer in the cup holder of the pickup. Doc. 41 at 2; Doc. 41-6. From these observations, Officer Butler formed the belief that Mortensbak was under the influence of alcohol. Doc. 41 at 2; Doc. 41-6. Officer Butler's belief was later confirmed (after Mortensbak was ultimately subdued) by a preliminary breath test and a blood draw, both of which indicated that Mortensbak had a blood-alcohol content of at least .267. Doc. 37 at 3; Doc. 30 at 3; Doc. 42-1 at 1. Officer Butler asked Mortensbak to turn over the keys to his vehicle, to which Mortensbak responded, "I can't do that." Doc. 41 at 2; Doc. 41-6. Officer Butler repeated the request and Mortensbak repeatedly refused. Doc. 41 at 2; Doc. 41-6. Officer Butler opened the driver's door to the pickup and tried to grab the keys, but Mortensbak pushed him back. Doc. 41 at 2; Doc. 41-6. The two men struggled, and Mortensbak punched Officer Butler in the face. Doc. 41 at 3. Mortensbak then put his pickup into gear, at which time Officer Butler withdrew from Mortensbak, and Mortensbak sped off as Officer Butler ran back to his patrol vehicle. Doc. 41 at 3; Doc. 41-6.

Officer Butler pursued Mortensbak through residential neighborhoods at high rates of speed, with Mortensbak at one point driving into a lawn and nearly hitting a pedestrian and a fire hydrant. Doc. 41 at 5; Doc. 41-6. To keep up with Mortensbak, Officer Butler had to drive faster than fifty miles per hour in a residential area. Doc. 41-6. During the pursuit, Officer Butler called for assistance from other officers and reported that Mortensbak had hit him in the face during the traffic stop. Doc. 41 at 5; Doc. 41-6.

After traveling on several different residential streets and running through multiple stop signs, Mortensbak turned onto South Lincoln Avenue, which is a dead end street. Doc. 41 at 4–5; Doc. 41-6. At the end of the street, Mortensbak turned left into an alley and struck a parked trailer. Doc. 41 at 4–5; Doc. 41-6. Mortensbak's vehicle stopped there momentarily, so Officer Butler got out of his vehicle, removed Doerak from the kennel, and connected him to a leash. Doc. 41 at 5. Officer Thelen arrived on the scene. Doc. 38 at 2. Officer Butler and Doerak, who was barking loudly, approached the vehicle and ordered Mortensbak out of the pickup. Doc. 38 at 2; Doc. 41 at 5; Doc. 41-6. Instead of complying, Mortensbak reversed the vehicle continuing his attempt to flee the police, but the pickup moved only a few feet as the wheels spun on the snow and ice. Doc. 38 at 2–3; Doc. 41 at 5; Doc. 41-6. Officer Butler then tried to open the driver's door several times while holding Doerak on the leash, but Mortensbak pulled the door shut each time. Doc. 38 at 3; Doc. 41 at 5–6; Doc. 41-6. Officer Butler was able to get the door open and saw Mortensbak make a motion that Officer Butler believed to be an attempt to get the pickup moving again. Doc. 41-6. At this point, Officer Butler commanded Doerak to apprehend Mortensbak. Doc. 41 at 6; Doc. 41-6.

Doerak attempted to engage Mortensbak but initially missed. Doc. 41 at 6; Doc. 41-6. Mortensbak tried to punch Officer Butler with his right hand, but Doerak was able to jump into the pickup, bite Mortensbak's right hand, and assist Officer Butler in dragging Mortensbak out of the pickup and onto the ground. Doc. 41 at 6; Doc. 41-6. Officer Butler threw four punches at Mortensbak as he was dragging him to the ground, though it is not clear that all of them made contact with Mortensbak. Doc. 41-6. Once Mortensbak was on the ground, Doerak released his bite and Officer Butler took Doerak by his leash. Doc. 41 at 7; Doc. 41-6. Officer Thelen held the passenger of the pickup at gunpoint as Officer Butler instructed Mortensbak to lie on the

8

ground.  Doc. 38 at 3; Doc. 41 at 7; Doc. 41-6.   However, Mortensbak tried to get back up, and Doerak engaged again with Mortensbak's right arm or shoulder while Officer Butler tried to push Mortensbak back flat on the ground with his right hand, still holding Doerak's leash in his left hand.  Doc. 41 at 7; Doc. 41-6.   Mortensbak continued to resist despite Officer Butler's repeated commands to get on the ground.  Doc. 41 at 7; Doc. 41-6.   During this second engagement, Officer Butler threw one punch and then pushed down on the back of Mortensbak's head or neck, apparently trying to push Mortensbak flat on the ground.  Doc. 41-6.   Officer Butler continued pushing on the back of Mortensbak's head for several seconds before throwing one more punch and pulling Doerak off of Mortensbak, though Mortensbak was still resisting the commands to lie on the ground.  Doc. 41-6.   Mortensbak immediately tried to rise off the ground after Officer Butler and Doerak released contact with him, and Mortensbak lunged forward reaching toward Officer Butler's service pistol with his left hand.  Doc. 41 at 7; Doc. 41-6.  Officer Butler was able to avoid Mortensbak's reach, and used the momentum to push Mortensbak to the ground.  Doc. 41-6.   Doerak re-engaged with Mortensbak's left arm, and Mortensbak continued to struggle against Doerak and Officer Butler, who threw three more punches in his effort to subdue Mortensbak.  Doc. 41 at 7; Doc. 41-6.

Mortensbak was still struggling and trying to get up moments later when Sergeant McManus arrived on the scene and aided Officer Butler by pushing Mortensbak flat onto the ground.  Doc. 41 at 7; Doc. 41-6.  Another officer, who is not a defendant in this case, arrived seconds after Sergeant McManus, and the two held Mortensbak down.  Doc. 39 at 2–3; Doc. 41-6.  Two more officers, Officers Siebenborn and Baker, arrived a few seconds later.  Doc. 39 at 2; Doc. 40 at 2; Doc. 41-6.  Officer Siebenborn assisted Sergeant McManus and the other officer in subduing Mortensbak, and Officer Butler led Doerak away from Mortensbak.  Doc. 39 at 2–3;

Doc. 41 at 7; Doc. 41-6.  Officer Baker assisted Officer Thelen, who had been providing cover for Officer Butler by holding the passenger of the vehicle at gunpoint during the entire struggle. Doc. 40 at 2; Doc. 41-6.

The officers were not able to get Mortensbak handcuffed until Officer Siebenborn arrived and helped wrestle one of Mortensbak's arms out from under his body.  Doc. 39 at 2–3.   From the time Doerak made his first attempt to engage Mortensbak in the pickup (19:20:11) to the time Officer Siebenborn arrived and Doerak disengaged for the last time (19:21:22), one minute and eleven seconds passed.  Doc. 41-6.  Video from Sergeant McManus's police vehicle shows that Doerak was several feet away from Mortensbak and completely disengaged twenty-three seconds later (19:21:45).  Id.  Officer Butler then secured Doerak in his kennel in the patrol vehicle.  Id.

Officer Butler threw, by the Court's count, nine punches during the entire altercation. Doc. 41-6.  Doerak did not bite Mortensbak after he was handcuffed, and was either near or in his kennel by the time Mortensbak finally was handcuffed.   No officer punched or beat Mortensbak after he was handcuffed even though Mortensbak continued to struggle, kicking Officer Smedsrud in the knee at one point.  Doc. 37 at 3; Doc. 39 at 3; Doc. 41-6.

Mortensbak was taken by ambulance to receive medical attention for the injuries he sustained during the struggle.  Doc. 39 at 3; Doc. 41-6.  According to Mortensbak, he received severe lacerations from the dog bites on many parts of his body, including damage to his right hand that will require surgery.  Doc. 1 at 8.  He also claims to have severe headaches, nasal problems, mental fatigue, and trouble sleeping.  Id.  Photos taken at the hospital clearly show injuries to Mortensbak's face and neck as well as what appear to be bite injuries to both of his arms, his left shoulder, his right hand, and at least one of his legs.  Doc. 1-1.

There is no evidence that Officer Clemens, Officer Lohr, or Randy Sample were present for, let alone involved in, any part of Mortensbak's arrest. Officer Gillespie arrived on the scene a few minutes before the ambulance took Mortensbak to the hospital, about fifteen minutes after the events which give rise to the excessive force claim, Doc. 41-6, and handled the DWI portion of the investigation, Doc. 39 at 3–4.

During a deposition taken in this case, Mortensbak admitted that he was intoxicated the night of the arrest and "vaguely" remembers the events that form the basis for his lawsuit. Doc. 42-1 at 1–2. Mortensbak also admitted that the video appears to show him making a punching movement at Officer Butler during the initial traffic stop, though he did not independently recall doing so. Doc. 42-1 at 7. Mortensbak admitted that the only claims he had against Officer Sam Clemens and Randy Sample were for making false statements, and thus he has no excessive force claims against those two defendants.[10] Doc. 42-1 at 7. Mortensbak also stated that his only claim against Jon Lohr is for improper training of the police dog. Id.

## III.   ANALYSIS

### A.  The Defendants in their Individual Capacities

Mortensbak claims that the use of force by Officer Butler, canine Doerak, and the other responding officers against him was excessive and seeks monetary damages in excess of four million dollars under 42 U.S.C. § 1983.[11] Doc. 1 at 1–6, 11. Section 1983 creates civil liability

---

[10]The Defendants also cite excerpts of Mortensbak's deposition that were not submitted as evidence to show his only claims against Officer Gillespie, Officer Thelen, and Officer Baker were for making allegedly false statements. Doc. 35 at 22–23. Because those portions of the deposition are not part of the evidentiary record and because those Defendants were on the scene, this Court will treat them the same as the Defendants who were originally alleged to have used excessive force.

[11]Mortensbak's Complaint also alleges that some of the Defendants made false statements to the media. Doc. 1 at 3. Only the excessive force claim survived this Court's initial screening. Doc. 7 at 6–7.

for a person who, acting under the color of state law, deprives another of his or her federal constitutional or statutory rights. 42 U.S.C. § 1983. However, "[q]ualified immunity shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Partlow v. Stadler, 774 F.3d 497, 501 (8th Cir. 2014). Courts use a two-step inquiry to determine whether qualified immunity applies: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Id. Although the two questions may be taken up by a court in either order, addressing first whether the plaintiff has shown facts which make out a constitutional violation can promote the development of constitutional precedent, especially in cases that arise infrequently in situations in which the qualified immunity defense is inapplicable. Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014). The excessive force allegations Mortensbak claims, especially the use of the police dog, is the sort of case that rarely arises outside the context of a qualified immunity defense. Therefore, this Court first will take up the question of whether the facts establish the possibility of a constitutional violation and then proceed to the issue of whether the possible constitutional violation, if proven, was of a clearly established right.

### 1. Whether a Constitution Violation Occurred

Mortensbak makes three arguments in support of his claim that the officers used excessive force in the course of his arrest. First, Mortensbak argues that using the police dog Doerak to apprehend him without giving a prior, verbal warning constitutes excessive force. Second, Mortensbak argues that the force used by Officer Butler to subdue him was excessive. Finally, Mortensbak argues that the other responding officers violated his right to be free from

unreasonable seizures by failing to intervene in Officer Butler's allegedly unconstitutional use of force.

Based upon the material facts not genuinely subject to dispute, no reasonable jury could find that the defendants used excessive force in securing Mortensbak's arrest. Excessive force is a Fourth Amendment claim for which the reasonableness standard is applied. Graham v. Connor, 490 U.S. 386, 396 (1989). The factfinder must balance "'the nature and the quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interest at stake." Id. (quoting United States v. Place, 462 U.S. 696, 703 (1983)). Such balancing requires considering the totality of the circumstances, but in particular "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. The standard is evaluated objectively, "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396–97. In the context of a motion for summary judgment, the issue is whether Mortensbak has "presented enough proof in support of his claim that a jury could properly find that the degree of force used against him was not 'objectively reasonable.'" Kuha v. City of Minnetonka, 365 F.3d 590, 597 (8th Cir. 2003), abrogated in part on other grounds en banc, Szabla v. City of Brooklyn Park, Minn. (Szabla III), 486 F.3d 385, 395–96 (8th Cir. 2007).

When a police dog is used to aid officers in the arrest of an individual, the same standard applies. See id. at 597–99 (applying the reasonableness standard to a claim that a police officer used excessive force when he allowed the police canine to track and bite a suspect). Mortensbak argues that Officer Butler was unreasonable when he "did not try to use disabling force" or give a "verbal warning" to Mortensbak before ordering Doerak to apprehend him. Doc. 1 at 6.

13

Mortensbak also claims that Officer Butler let Doerak bite him for an excessive period of time after other officers had arrived to help arrest Mortensbak and that Mortensbak had been handcuffed "all the time . . . Officer Butler was hitting him **and** the dog was attacking him." Id. (emphasis in the original).

Taking into consideration the totality of the circumstances surrounding Mortensbak's arrest, a jury could not properly find that releasing Doerak without giving an explicit verbal warning was unreasonable. First, the Court considers the three factors of particular importance from Graham. 490 U.S. at 396. At the time Doerak was deployed, Mortensbak, noticeably drunk, had led Officer Butler on a high-speed chase through residential areas of Sioux Falls, putting himself, Officer Butler, Mortensbak's passenger, and others in the area at risk. When Doerak was deployed, Mortensbak was still resisting arrest and appeared to be trying to get the pickup moving again to resume his flight. In addition to driving under the influence and the wrong way on a one-way street, Mortensbak had assaulted a police officer and eluded police. These offenses are serious and would have led a reasonable officer to infer at the time that Mortensbak would not succumb to apprehension peacefully and was willing to put officers and the public in danger in order to avoid arrest. Therefore, all three Graham factors—severity of crime, safety of the officers and public, and resistance of the subject—suggest that the use of force, including the assistance of a police dog to subdue Mortensbak, was objectively reasonable.

The Supreme Court recently decided Plumhoff v. Rickard, 134 S. Ct. 2012 (2014), a case that was factually similar to this case. In that case, Rickard had led police on a chase that seemed to have come to an end when the car he was driving collided with a police cruiser in a parking lot. Id. at 2017. However, as police approached Rickard's car and pounded on the window with guns in hand, Rickard reversed his car "in an attempt to escape." Id. Police shot

14

three times through the window of Rickard's car, and as Rickard continued to maneuver onto the street, the police shot twelve more rounds into the car. Id. at 2017–18. Rickard lost control, crashed into a building, and died from a combination of gunshot wounds and injuries suffered in the crash. Id. at 2018. The Supreme Court found that, despite the fact that Rickard had stopped momentarily, "all that a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." Id. at 2022. Therefore, the Supreme Court found that any reasonable jury would find that the police officers acted reasonably in using deadly force to stop the "grave public safety risk" created by Rickard's conduct. Id.

Mortensbak acted similarly to Rickard in trying to escape officers and, by doing so, posed a grave risk to the officers and the general public. Even after Mortensbak's collision with the trailer and after Officer Butler approached him with Doerak barking loudly at his side, it was clear Mortensbak was intent on resuming his flight. With Mortensbak pulling the door shut, ignoring commands, and attempting to back the vehicle up, Officer Butler had every reason to believe that Mortensbak would continue to try to escape until apprehended, and no jury could find that his use of less-than-deadly force, both forcibly removing Mortensbak from the vehicle and deploying Doerak, was unreasonable. See Plumhoff, 134 S. Ct. at 2022; see also Kuha, 365 F.3d at 598 (finding that the use of a police dog trained to track and bite is not "deadly force").

Officer Butler's use of Doerak without first giving an explicit verbal warning to Mortensbak does not make the use of force unreasonable. A verbal warning is not necessarily required in all situations to make reasonable the use of a police dog to apprehend a subject. In Kuha, the United States Court of Appeals for the Eighth Circuit concluded that a jury could properly find it unreasonable for a police officer to deploy a police dog to track and bite a hiding

subject without first giving a warning. 365 F.3d at 595. The Eighth Circuit reasoned in Kuha

that while a verbal warning "that a police dog was present and trained to seize by force" will not

always result in a peaceful surrender, the absence of such a warning made the use of force "a

nearly foregone conclusion." Kuha, 365 F.3d at 599. Subsequent cases have gone on to imply—

or even explicitly state—that Kuha established the rule in the Eighth Circuit that a warning must

be given prior to deploying a police dog to apprehend a subject. Szabla v. City of Brooklyn

Park, Minn (Szabla I), 429 F.3d 1168, 1173 (8th Cir. 2005) ("[I]t was not clearly

established . . . until Kuha . . . was decided . . . that it was always unconstitutional to use a police

dog to bite and hold a suspect without giving a prior warning."), vacated in part on other grounds

on reh'g en banc, 437 F.3d 1289 (8th Cir. 2006); McKay v. City of Hayward, 949 F. Supp. 2d

971, 984 (N.D. Cal. 2013) ("The Eighth Circuit held that after 2003, it is 'always

unconstitutional to use a police dog to bite and hold a suspect without giving a prior warning.'"

(quoting Szabla I, 429 F.3d at 1173)). However, in Kuha, the Eighth Circuit recognized that a

verbal warning prior to releasing a police dog may not be required in all situations. 365 F.3d at

599 (noting that there may be "exceptional cases" in which a "warning is not feasible").

Importantly, the factual circumstances surrounding the decision in Kuha are very different from

the facts in this case, making Kuha inapposite.

   In Kuha, the subject had fled a traffic stop on foot and hid in a swampy area. Id. at 595.

A canine officer arrived as backup to help find the subject. Id. The canine's handler gave him

the command to "find" the subject, which meant that the dog would track the subject and bite

him, in order to hold the subject until the handler arrived. Id. In short, the subject was hiding—

not actively resisting the officers who were trying to find him—and there was no indication that

he knew or should have known that a police dog was there and could potentially bite him. Thus,

the Eighth Circuit reasoned, the officers had the opportunity to avoid the use of force by giving a loud verbal warning to the subject (and anyone else in the area) and allowing him the opportunity to surrender peacefully before the dog was deployed.  Id. at 598–99.  In this case, Mortensbak was actively resisting the officers by assaulting Officer Butler, leading him on a high-speed chase, shutting his door and trying to restart the pickup, and not obeying Officer Butler's commands.  Mortensbak had already made the decision not to surrender peacefully and was not entitled to a warning that further resistance may trigger the use of the police dog visible to Mortensbak to secure his surrender.  Such a rule would create untenable circumstances because it could logically be extended to any use of force in similar situations.[12]  Szabla I did not extend the holding in Kuha to circumstances involving subjects who were actively resisting police; it involved a case in which a subject had fled the scene of an accident prior to the arrival of police, and the police dog tracking the subject bit a homeless man sleeping in a shelter who had no connection to the accident and no indication that a police dog could be deployed.  Szabla I, 429 F.3d at 1171–72.  Furthermore, since Kuha and Szabla I, the Eighth Circuit has affirmed the reasonableness of using a police dog to apprehend a subject who was actively resisting police with no mention of whether a verbal warning was made.  Mann, 497 F.3d at 826 (8th Cir. 2007) ("In light of [the subject's] failure to comply with the officers' instructions and warnings, we cannot say that [the officer's] use of [the police dog] in a bite and hold maneuver on [the subject's] leg could be considered an unreasonable use of force for the purpose of bringing the

---

[12]As noted above, the use of a police dog is not considered deadly force.  Kuha, 365 F.3d at 598. If an actively-resisting subject were entitled to an explicit verbal warning before the use of a police dog, then logically such a warning would need to be required for other, more lethal forms of force.  Exigent circumstances make such warning requirements impracticable.  For instance, such a requirement could be construed to require a police officer to verbally warn a subject who draws a firearm on him or her before deploying his or her own weapon in self-defense, which of course is entirely unworkable and inappropriate to expect.

non-compliant [subject] under control."). Because of the factual differences between Kuha and this case, the rule in Kuha requiring a verbal warning before deployment of a police dog to apprehend a hiding suspect does not apply in this case.[13]

Mortensbak's other claims about the force used by Officer Butler and canine Doerak have no basis in reality. Mortensbak's assertions that Officer Butler punched him and deployed Doerak against him while he was handcuffed are clearly contradicted by the police video. *Ipse dixit* statements that are clearly contradicted by the evidence do not create a genuine dispute of fact and do not on their own defeat a motion for summary judgment. Mann, 497 F.3d at 825. No reasonable jury could find that the use of force deployed to arrest Mortensbak was unreasonable, so Mortensbak has failed to establish a constitutional violation with regard to Officer Butler in his individual capacity.

Mortensbak claims that the other officers involved in the arrest, specifically Officer Smedsrud, Sergeant McManus, and Officer Siebenborn, either used excessive force in aiding in his apprehension or are liable to him for failing to intervene during Officer Butler's alleged use of excessive force. However, the claims that other officers personally used excessive force are clearly contradicted by the evidence. Officers arriving on the scene aided Officer Butler in wrestling Mortensbak, who continued to resist arrest and pose a danger to the officers' safety, to the ground and effectuating the arrest. There is no credible evidence from which a jury could find that the officers used an unreasonable amount of force in this assistance. And while an officer may be liable for failing to intervene to prevent another officer's use of excessive force against a subject, such liability is contingent upon, among other things, the primary officer using

---

[13]Even if the Kuha rule were applicable to this case, Doerak's constant barking during the encounter and Officer Butler's uniform, which indicated his status as a canine officer, gave Mortensbak reasonable warning that noncompliance could result in the deployment of a police dog.

excessive force in the first place. See, e.g., Hicks v. Norwood, 640 F.3d 839, 843 (8th Cir. 2011). Neither Officer Butler nor any other officer used excessive force in apprehending Mortensbak, and thus no officer violated Mortensbak's right to be free from excessive force by failing to intervene.

### 2. No Violation of a Clearly Established Right

Even if a reasonable jury could find that Mortensbak's Fourth Amendment rights had been violated, the second prong of the qualified immunity doctrine—whether the officers violated a clearly established right—would shield the Defendants from liability. In order for a right to be considered clearly established, the "contours" of the right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Plumhoff, 134 S. Ct. at 2023. The key issue is whether "the official acted reasonably in the particular circumstances that he or she faced," so the clearly established law is not to be defined "at a high level of generality." Id. (internal quotations omitted). Clearly established law may be created by either controlling authority in the jurisdiction or by a "robust consensus of cases of persuasive authority." Id. (internal quotations omitted).

There is no controlling authority that creates clearly established law requiring police officers to give a verbal warning prior to using a police dog to apprehend a subject who is actively resisting arrest and who is plainly aware that a police dog is present. The Kuha decision, as noted in the previous section, is factually distinct from this case because the defendant in Kuha would have had the opportunity, upon receiving a verbal warning, to peacefully surrender to the police. Mortensbak by contrast had repeatedly spurned opportunities for peaceful surrender before the police dog was deployed. Mortensbak had punched Officer Butler during the initial traffic stop, fled at high speed in a residential area, crashed into a trailer

19

yet still tried to drive off, and was actively resisting arrest by struggling with Officer Butler when Doerak was deployed.  The Eighth Circuit decision in Mann affirming the reasonableness of the use of a police dog to apprehend an actively resisting subject involved circumstances more similar to this case than Kuha and created enough ambiguity that the constitutionality (or unconstitutionality) of deployment of a police dog in this situation was not "beyond debate" at the time of Mortensbak's arrest.  See Plumhoff, 134 S. Ct. at 2023.

There also is no "robust consensus of persuasive authority" on the issue.  Like Kuha, other federal circuit court decisions finding that a verbal warning is required before deployment of a police dog are factually distinguishable from this case.  See Vathekan v. Prince George's County, Md., 154 F.3d 173 (4th Cir. 1998) (releasing police dog to track a possible burglar into a home where the dog bit the sleeping homeowner); Kopf v. Wing, 942 F.2d 265 (4th Cir. 1991) (releasing police dog on trapped suspect found hiding in a narrow alley).  Other circuit courts of appeals have declined to create a rule requiring police to give a verbal warning before deploying a police dog to apprehend a subject.  Johnson v. Scott, 576 F.3d 658, 660–61 (7th Cir. 2009) (finding use of dog to apprehend suspect who had been fleeing until mere seconds before the police dog engaged was reasonable and that the police officer had "no real opportunity" to warn the suspect); Grimes v. Yoos, 298 F. App'x 916, 924 (11th Cir. 2008) (per curiam) (finding deployment of police dog without a prior warning to track hiding or fleeing suspect was a reasonable use of force).

The other actions which constitute a use of force by Officer Butler do not violate clearly established law of which a reasonable officer in his situation would have known.  The right to arrest a person necessarily includes the right to apply reasonable force when the person resists arrest.  Graham, 490 U.S. at 396.  The facts of this case show that the Defendants involved in

Mortensbak's arrest used less-than-deadly force to effectuate arrest. Supreme Court precedent at the time would have given the officers on the scene reason to believe that such less-than-deadly force was reasonable to end Mortensbak's flight and arrest him. See Brosseau v. Haugen, 543 U.S. 194, 197–98 (2004) (per curiam) ("But '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.'" (quoting Tennessee v. Garner, 471 U.S. 1, 11 (1985))). Mortensbak's claims of continued police force after being handcuffed were clearly refuted by the video from the officers' patrol vehicles. Therefore, the officers' conduct could not have constituted a violation of clearly established law, and qualified immunity would shield the Defendants from any liability.

### B. The Defendants in their Official Capacities

Mortensbak has sued all Defendants in their official capacities as well as their individual capacities. Doc. 1 at 3. Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165–66 (1985) (quoting Monell v. New York City Dep't of Soc. Srvs., 436 U.S. 658, 690 n.55 (1978)). A municipality may not be held liable solely on the basis that a constitutional violation was committed by one of its employees. Monell, 436 U.S. at 693–94. "[I]n an official-capacity suit the [municipality's] 'policy or custom' must have played a part in the violation of federal law." Id. at 166 (quoting Monell, 436 U.S. at 694). To survive a motion for summary judgment for a claim made against a municipality, a plaintiff must show some evidence that the claimed constitutional violation is more than a one-time occurrence, i.e. that the action was taken in accordance with a policy or custom or that the city failed to create a policy or custom despite a

21

pattern of similar constitutional violations making additional policies necessary. Szabla III, 486 F.3d at 392–93.

Even if this incident were to rise to the level of excessive force, Mortensbak has presented no evidence that this was anything more than a one-time incident or that it was carried out in accordance with an unconstitutional custom or policy of the Sioux Falls Police Department. Therefore, his claim against the City of Sioux Falls, through the officers in their official capacities, cannot survive the motion for summary judgment.

### C. Pending Motion for Appointment of Counsel

Mortensbak recently has filed a renewed motion to appoint counsel to help him pursue this case. Doc. 53. This Court has denied Mortensbak's repeated requests to appoint counsel. Docs. 10, 26, 33. There have been no changes in the circumstances since this Court's last ruling on Mortensbak's request for appointed counsel which would justify reconsideration of this request. Therefore, for the reasons stated in the previous orders, Mortensbak's request is denied.

### IV.   CONCLUSION

The Defendants have put forth evidence not subject to genuine dispute establishing that the use of force used against Mortensbak was done in the process of trying to effectuate a lawful arrest, which Mortensbak was actively resisting. Mortensbak has come forward with no evidence that creates a genuine dispute for a factfinder to resolve. The Defendants are entitled to judgment as a matter of law because the Defendants involved in Mortensbak's arrest used a reasonable amount of force to effectuate that arrest in accordance with the requirements of the Fourth Amendment and because qualified immunity would shield the Defendants from any liability. Therefore, for the reasons stated above, it is hereby

ORDERED that Mortensbak's motion to appoint counsel, Doc. 53, is denied. It is further

ORDERED that Defendants' Motion for Summary Judgment, Doc. 34, is hereby granted.

It is further

ORDERED that no certificate of appealability enter.

DATED this 24ᵗʰ day of February, 2015.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

23